[Civ. No. 11448. First Dist., Div. One.—May 7, 1941.]

THE PEOPLE ex rel. DOROTHY JONES et al., Wards of the Juvenile Court, Respondent, v. JOHN SAVAGE, Appellant.

Joseph T. Curley and Marvin C. Hix for Appellant.

Matthew Brady, District Attorney, and Edward M. Leonard, Assistant District Attorney, for Respondents.

KNIGHT, J.—This appeal was taken by John Savage, guardian of the persons and estates of Dorothy and Bernard Jones, from a judgment of the juvenile court. The children are full orphans, and at the time of the rendition of the judgment were respectively 14 and 11 years of age. At that time also they were and for nearly two years prior thereto had been living with and being cared for by appellant and his wife at their home in San Francisco. Under the terms of the judgment, which was entered on March 29, 1939, the children were declared wards of the court, removed from the Savage home, and placed in the custody of the probation officer until they attained the age of 21 years or until further order of court; and the treasurer of the city and county

was directed to pay to the probation officer $40 a month for their support and maintenance.

As stated by the court at the time the judgment was rendered, it was the intention to transport the children to London, England, to live permanently with their paternal relatives as soon as arrangements could be made therefor. As shown by the bill of exceptions upon which the appeal was taken, at none of the hearings was any sworn testimony taken. The judgment is based entirely on written and verbal reports made by the probation officers and statements made by the interested parties, not made under oath; and a private interview with the children. The factual background of the case and a summary of the proceedings leading up to the rendition of the judgment as disclosed by the bill of exceptions may be stated as follows: James and Elizabeth Jones, the parents of the children, lived in Contra Costa County. The father died in 1935, and in May, 1937, the mother was the victim of a homicide. Prior to his death the father had been in poor health and the family was receiving aid from the county. He was a native of Ireland, and was survived by a sister, Mrs. Lewis Oliver, living in Los Angeles, and several brothers and sisters in England. Mrs. Jones was born in Ireland, and among the relatives surviving her in this country was an uncle, Peter Benson, residing in Alameda County. For many years appellant and his wife maintained their home in San Francisco. By occupation appellant is a stationary engineer, and is employed steadily at the San Francisco Hospital; and all of the reports of the probation officer show that the Savages have always enjoyed an excellent reputation. Appellant had been a close friend of the father of the children for many years, and the two families were intimate in their social relations. Upon the death of the mother the Savages went immediately to Contra Costa County and with the permission of the authorities brought the children to San Francisco to live with them, with the understanding that said county would continue aid for the children in the Savage home. Mrs. Jones left a small estate consisting of money, and Peter Benson applied for and was granted letters of guardianship of the children. At this time Mrs. Oliver was in England, and upon her return in November, 1937, she applied to the court in Contra Costa County to be appointed guardian in the place

of Benson, with the view of taking the children to England to live with their father's relatives. Soon after Benson's appointment as guardian he was stricken with illness and died; whereupon appellant filed an application to be appointed guardian in opposition to the pending petition of Mrs. Oliver; and his petition was granted. All except $226 of the guardianship funds were expended under court order, the Savages having received only $180 to reimburse them for the money they had expended in behalf of the children during the time they had been caring for them. Meanwhile Contra Costa County had been threatening to discontinue the aid, claiming that it should be taken care of by San Francisco, and later in 1938 appellant applied to the social welfare department in San Francisco for the $20 a month allowance for each child provided by law for the care of full orphans. The department referred him to a senior probation officer, and appellant was advised that it would be necessary for him to file a petition in the juvenile court. Thereafter he was furnished with printed forms of two petitions with the blank spaces filled in with typing, one of which was an application for state and county aid, and the other a petition addressed to the juvenile court. He signed and verified both, and the petition addressed to the juvenile court was filed on January 24, 1939. The petition contained the allegation that the children were destitute and that there were no means of support through appellant or the relatives. But the record shows beyond question that appellant's only purpose in signing and filing the petition was to obtain state and county aid, and that he and his wife had no thought whatever of surrendering the custody of the children. At the hearings which followed, however, the probation officer recommended the plan to deliver the custody of the children to Mrs. Oliver with the understanding that she would transport them to London to reside permanently with her brothers and sisters in that city; and the court agreed to the plan and expressed its intention of having it carried out. Appellant vigorously protested against such action, and it was made perfectly plain by appellant and his wife that they would forego the aid rather than give up the custody of the children, and when it became apparent that their protest was unavailing, appellant moved through his attorney to dismiss the proceeding he had instituted. The motion was denied, the court

saying that "the Savages had no place in the planning for these children since there were relatives who had prior right even though Mr. Savage was their legal guardian". Thereupon and "without any trial", so the bill of exceptions recites, the court granted the motion made by the probation officer that the children were declared wards of the court, and they were delivered into the custody of the probation officer to await completion of the arrangements to send them to London.

Shortly after the entry of the judgment appellant applied to this court for a writ of *habeas corpus,* and after a hearing it was held that from the record then presented it appeared that the juvenile court acquired jurisdiction to hear and determine the proceeding; that its judgment was valid on its face, that on *habeas corpus* it was beyond the power of this court to review the evidence or any errors or irregularities which were alleged to have occurred before the juvenile court, that the law afforded appellant an adequate remedy for such purpose by way of appeal from the judgment. (*In re Jones,* 34 Cal. App. (2d) 77 [93 Pac. (2d) 185].) The cause again came before this court on appellant's application for a writ of mandate to require the settlement of a bill of exceptions; and the writ was granted. (*Savage* v. *Superior Court,* 36 Cal. App. (2d) 521 [97 Pac. (2d) 990].) Meanwhile, under the direction of the probation officer, the children were placed and they have since remained in separate private homes in different localities; and within a few months after the rendition of the judgment the European war started, which has made it impossible to carry out the plan to send them to London.

■ Disregarding all questions of alleged irregularity or error in the hearing of the proceeding, and conceding for all purposes of the appeal that the trial court acquired jurisdiction to hear and determine the proceeding, we are of the opinion that under the circumstances appearing in the record, appellant, as a matter of legal right, was entitled to a dismissal of the proceeding; and that in any event, treating the reports of the probation officers and the unsworn statements of the interested parties as competent evidence, the controlling finding upon which the judgment rests, namely, that the children were destitute and that there were no

means of support through the guardian or the relatives, is contrary to the undisputed facts of the case.

With respect to the question of the right of dismissal, while juvenile proceedings are instituted in the name of the people of the state, it has been definitely held that such proceedings in dealing with cases of dependent children, are not of a criminal nature and should not be treated as such. (*In re Edwards*, 99 Cal. App. 541 [278 Pac. 910, 290 Pac. 591].) Here the proceeding was not instituted by anyone connected with the administration of the juvenile law. It was filed by appellant solely at the instance and under the advice of the probation officer as a means of settling the controversy which had been carried on between Contra Costa County and the city and county of San Francisco over the payment of aid. In this regard it is stated in the report of the probation officer: "The Probation Officer feels that Contra Costa county was not fair in shipping the children to this community without aid, nor was the State Department consistent in their advising Mr. Savage that he could secure State aid only until August, 1939. However, Mr. Savage's application has been presented to the court for decision regarding eligibility of the children to receive aid." And again in the report it is stated that from the very beginning, when the children came to San Francisco in 1937, the probation officer was very reluctant to go ahead with the application for state aid because it was felt that the responsibility belonged to Contra Costa County. Furthermore, throughout the reports that were filed it is expressly stated that the Savages were devoted to the children and that the children were devoted to them; that the children were never in want and were in excellent health, and very happy in their surroundings; that they were Catholic and were being educated and trained in Catholic schools; that the Savages were sincerely desirous of giving the children a permanent home and had stated on several occasions that they would give up the right to aid rather than give up the custody of the children. It is repeatedly so stated in the reports; for example, in one place it is stated: "As Mr. Savage was granted guardianship of the persons and estate of the Jones children, he is very reluctant to have this set aside or have any plan made for the children, other than to have them remain in his home." The report also states in sub-

stance and quotes figures to show that without the aid the Savages were amply able to provide for the children. Therefore, when it became apparent to appellant that it was the custody of the children and not the matter of aid that was being made the issue and that he was about to be deprived of the custody of the children, it was his legal right, in our opinion, to cause a dismissal of the proceeding. We find nothing in the juvenile law which may be construed as preventing him from so doing; being the duly appointed guardian he stood in the same position and was entitled to the same rights as a parent.

An entirely different situation would arise if such a petition as this were filed by someone in authority or by a third party; also in a case where filed by a parent or guardian and there was evidence before the court to show that the dependent child was in fact destitute or that it was being neglected either as to proper maintenance, training or education. But no such claim is here made, and the facts show to the contrary. ■ Respondent calls attention to certain language used in deciding the proceeding in *habeas corpus* to the effect that since it affirmatively appeared that the juvenile court acquired jurisdiction of the proceeding it was within the discretion of the trial court to deny petitioner's request for permission "to withdraw" his petition. But it is also stated therein that the facts of the case were not at that time before the court and that even if they were they would not be subject to review in a proceeding of that kind; whereas now the record of the entire proceeding, including all factual matters, is before the court.

■ What has been said with respect to the matter of dismissal applies with equal force to the question of the sufficiency of the facts to sustain the finding that the children were destitute and without means of support from the guardian or the relatives. As will appear from the record, the underlying reason for the recommendation of the probation officer and the holding of the trial court that the Savages be deprived of the custody of the children was not that the children were destitute or could not be provided for by the Savages, but because of the belief that the children should be with the kinsfolk. In this connection the probation officer stated to the court: "I know there is no question of the kind of care they [the Savages] are giving the children

but there is a question as to whether or not the children don't belong to the relatives and whether the relatives cannot provide for them.'' And in accord therewith the court in addition to the remarks above referred to stated (quoting from the bill of exceptions) ''that he felt the children should be sent to their relatives in England and that they should be with their blood kin and that arrangements should be made as soon as possible to send them there and that they were going to England.'' It would seem, however, that a question of that kind was one to be heard and determined in the probate court in the exercise of its jurisdiction in dealing with guardianship matters and that the process of the juvenile court may not be invoked for such purpose. As above pointed out, the contested issue as to whether the paternal relatives were entitled to the custody of the children in preference to the Savages was determined in the guardianship proceding in Contra Costa County, and such adjudication has never been set aside. It may be conceded that even in that situation the jurisdiction of the juvenile court may be invoked where there is destitution and neglect, but as already shown there is no factual basis for such a finding in the present proceeding.

For the reasons and upon the grounds stated it is ordered that the judgment be reversed with instructions to grant appellant's motion to dismiss the proceeding.

PETERS, P. J., Concurring.—I concur with the reasoning and conclusions contained in the opinion prepared by Justice Knight.

We are faced in this case with a situation where the Juvenile Court has seen fit to take the custody of these two children from their lawfully appointed guardian in a most informal proceeding ''without any trial'', and to place their custody in the probation officer, for the sole purpose of sending the children to England, without any showing of unfitness of the guardian or inability to support the children, and over the protests of the guardian that he desired to dismiss his petition, and over the protests of the children that they desired to remain with the guardian. Although it may be conceded that the Juvenile Court may thus modify the decree of the Probate Court appointing a guardian, under no theory has the Juvenile Court the power to thus collaterally attack

678

and set aside the decree of the Probate Court in the absence of some showing so as to bring the case within the provisions of § 700 of the Welfare and Institutions Code.

There are certain factors mentioned but not emphasized in the opinion of Justice Knight that, in my opinion, conclusively answer every contention contained in the dissenting opinion of Justice Ward.

1. In the first place, the record conclusively demonstrates that the sole reason why the trial court determined to take the custody of these children from their lawfully appointed and acting guardian was that, in his opinion, the children would be better off with their paternal relatives in England. The bill of exceptions recites that near the close of the informal proceedings in which the order here appealed from was made "Judge Dunne stated that he felt the children should be sent to their relatives in England and that they should be with their blood kin and that arrangements should be made as soon as possible to send them there and that they were going to England." The matter was then continued for the sole purpose of awaiting the report of the American consul in London on the financial ability of the relatives there to support the children. Thereafter, the guardian moved to dismiss the petition. The record states: "Judge Dunne then stated that the matter had been gone into and that there were relatives who had come forward offering the children a home and that the motion should be denied, and that the Savages had no place in the planning for these children since there were relatives who had a prior right even though Mr. Savage was the legal guardian." The Probation Officer then moved that the children be declared wards of the Juvenile Court "committed to the care of the Chief Probation officer, and held for placement with relatives."

It is quite obvious from a reading of the record, and no other inference or conclusion is possible, that the trial court was of the opinion that the children would be better off in England and that it was for this reason alone that their custody was taken from their guardian. The Juvenile Court has no jurisdiction to modify the decree of the Probate Court for such a reason. Section 700 of the Welfare and Institutions Code, under which this proceeding was instituted, contains no such ground for exercising jurisdiction. That might

well be a factor in a contest to modify the guardianship decree but it has no place in this Juvenile Court proceeding.

Moreover, even if such a factor were relevant in this proceeding, it is now impossible, because of the present war, to send the children to England. At the oral argument it was admitted by counsel for the respondent (although he contended such facts should not be considered) that since the entry of this decree in March of 1939 the children have been placed in foster homes, have been separated from each other, and have frequently expressed a desire to return to the Savages. Certainly it was never contemplated by the trial court at the time of this hearing that these children should be separated and placed in foster homes. As already pointed out, the factor that motivated the trial court was that the children would be better off in England with the paternal relatives. It having become impossible to carry out the decree as intended, the decree must fall.

2. In the second place, there is no evidence in the record that the Savages are unfit to have custody of these children, or unable to support them. Quite to the contrary, the evidence, without conflict, shows that they have given these children a fine home and loving care. The children obviously love the Savages and want to be with them. The dissenting opinion makes much of the fact that Mr. Savage verified a petition alleging that the children were destitute. That is true. But it is also true that the record, without conflict, shows the circumstances under which that petition was filed. Mr. Savage had discussed many times with the Probation Officer, and other employees of the Juvenile Court, the question of securing state and county aid for the children. He had also discussed the matter with the County Welfare Board of San Francisco. The San Francisco authorities quite obviously felt that the Contra Costa authorities and the State Welfare Department had acted improperly in the matter. There is not one word of testimony that Mr. Savage ever contemplated putting in issue the question of the custody of the children. The sole question involved was state and county aid. He was told that to secure such aid he must sign certain petitions. These were handed to him already filled in with typewriting. He believed, and reasonably so, that the only question involved was whether he was entitled to state and county aid. Apparently the Ju-

venile Court authorities mistakenly believed that aid could be granted only to wards of the court. When the hearing developed into a hearing relative to custody, Savage immediately sought to dismiss that petition. This he should have been permitted to do. The evidence demonstrates that the petition was filed as a result of mistake and error. Although Savage had stated in the petition that the children were destitute, before the end of the hearing both he and his wife stated that they wanted the children regardless of aid. That being so, there is no evidence to support the finding of destitution.

The dissenting opinion quotes almost in its entirety the prior opinion of this court in the *habeas corpus* proceeding. That proceeding involved the pleadings and not the evidence. The evidence could not properly be, and was not, considered in that proceeding. None of the facts above-mentioned, based on the evidence, were involved in that proceeding. For these reasons I concur in the order contained in Justice Knight's opinion.

WARD, J., Dissenting.—I dissent.

The majority opinion directs a reversal of the judgment with instructions to grant appellant's motion to dismiss. The conclusion is based upon two grounds: that as a matter of legal right appellant was entitled to a dismissal, and that the finding that the children were destitute is contrary to undisputed facts.

It is not held that the motion to dismiss should be granted as a matter of law, except as stated, "that under the circumstances appearing in the record, appellant, as a matter of legal right was entitled to a dismissal." The only "circumstances" referred to in the opinion are the record itself and the inferences drawn from certain acts, statements and reports. Considering the right of dismissal, it must be borne in mind that the petition to declare the children wards of the juvenile court had been filed and the matter had proceeded by way of several hearings before appellant's attorney, who had been present at such hearings, presented a motion to dismiss the petition. The record in fact shows that no suggestion of dismissal was made until the court indicated that the custody of the children would not be given appellant.

In a hearing on *habeas corpus* upon this same matter, it was determined that "In thus disposing of the proceeding the juvenile court conformed to all procedural requirements of the juvenile court law; and admittedly the judgment itself is in legal form", also that "the record reveals no ground upon which it may be held that petitioner was deprived of any legal right granted by the juvenile law; and since it affirmatively appears that the court acquired jurisdiction of the proceeding and of the parties in conformity with the requirements of the statute, it was entirely within the discretion of the court to deny petitioner's request for permission to withdraw his petition." (*In re Jones,* 34 Cal. App. (2d) 77, 81, 83 [93 Pac. (2d) 185].)

On the question presented—custody of the children—the *habeas corpus* decision *In re Jones, supra,* is *res judicata* on the matter covered by the above quotation (*In re Holt,* 34 Cal. App. 290 [167 Pac. 184] ; *In re Stratton,* 133 Cal. App. 738 [24 Pac. (2d) 832]) so long as the facts, the welfare of the child and the rights of all parties are the same (*In re Gille,* 65 Cal. App. 617 [224 Pac. 784]), as they are in this proceeding.

*In re Jones, supra,* pages 78, 79, 80, contains the following lengthy recital of the facts: "Two hearings were had before the juvenile court; petitioner and his attorney were personally present at both, and at the final hearing petitioner requested permission to withdraw the petition. His request was denied, and at the conclusion of the hearing the court found that the status of the children fell within the provisions of subdivision c of section 700 of the Welfare and Institutions Code, and accordingly adjudged them to be wards of the court and committed them to the custody of the probation officer. Shortly afterwards they were placed temporarily in private homes, it being the intention of the court ultimately, as expressed at the final hearing, to award permanent custody to relatives in England. . . .

"The writ of *habeas corpus* was issued upon the strength of certain allegations in the petition to the effect that no evidence whatever was taken at any time 'in behalf of any person'; that petitioner sought to introduce testimony at the final hearing of the matter but was not permitted to do so; that consequently the judgment is without evidentiary support. But the record produced at the hearing in support

of the return to the writ clearly negatives such allegations and shows a substantial compliance with all necessary jurisdictional requirements. It appears therefrom that when petitioner made application to have the children adjudged wards of the court the probation officer, in conformity with the provisions of sections 638 and 639 of the Welfare and Institutions Code, caused a full and complete investigation to be made of the case, including an inquiry into the antecedents, character, family history and environment of said children, and made a written report thereof to the judge of the juvenile court. This written report was presented to the court in accordance with section 640 of said code at the first hearing of the matter, held on January 25, 1939, and was at all times open to the inspection of petitioner and his attorney. Present at said hearing were Miss Leete, the children, petitioner and his wife and their attorney, and Mrs. Oliver . . . the court interrogated all interested parties, especially as to the family history, the chief question at issue being whether it would be to the best interests of the children to place them with their relatives in England as requested by Mrs. Oliver, or to allow them to remain with petitioner and his wife.''

Regarding a hearing on a supplemental report, the same opinion states (p. 81) : '' . . . that petitioner had informed the probation officer it would not be possible for him to take care of the children without state and county aid. . . . Thereupon, and after the court had expressed the conviction that the children should be reared by their kinsfolk, petitioner asked permission to withdraw his petition; but the judge replied that inasmuch as the relatives had come forward and offered the children a permanent home, he felt that petitioner's request to withdraw the petition should be denied.''

It is further stated at page 82: "It is true the hearing was not conducted with all the strict formality of a criminal proceeding; but it was not necessary to do so because as frequently pointed out by the courts, proceedings of the juvenile court in dealing with cases of dependent children are not of a criminal nature. (*In re Edwards*, 99 Cal. App. 541 [278 Pac. 910, 290 Pac. 591], citing earlier cases.) Such court operates under special powers, in conformity with pro-

cedure prescribed therefor by the juvenile court law, which authorize the consideration by the juvenile court, in cases of this kind, of the written reports and recommendations of the probation officer, which under said law are open to inspection of the interested parties. (Secs. 638, 639 and 640, Welfare and Institutions Code.) In other words, from its very nature and because of necessary qualifications for doing the work for which it is intended, the juvenile court was not designed as a trial court in the ordinary sense; and its method of operation is very different from the one governing in the trial of criminal cases, mainly because technicalities and formalities are largely eliminated.'' However, it was also stated in the opinion on the *habeas corpus* proceeding that there was an adequate remedy on appeal. It may be concluded therefore that if any reason appears to hold that ''appellant, as a matter of legal right, was entitled to a dismissal'', it must be found in the inferences that may be drawn from the written reports of the probation officers and the evidence and statements of all parties at the several informal hearings.

The majority opinion seems to hold that because the judge of the juvenile court stated ''he felt the children should be sent to their relatives in England'', the matter was one to be heard in probate court. The children have not been sent to England, but if that contingency should arise and it should then be determined that such is the proper course to pursue, having in mind the welfare of the children, there will be time enough to invoke the jurisdiction of the probate court to vacate the order appointing appellant as guardian, which appointment should play but a small part in the consideration of this appeal. The facts in relation thereto are set forth in the opinion in *In re Jones, supra,* wherein it was held that the juvenile court in San Francisco had obtained jurisdiction in the present matter.

The majority opinion also holds that, irrespective of the guardianship proceeding in Contra Costa County, and that the adjudication thereon has never been set aside, ''It may be conceded that even in that situation the jurisdiction of the juvenile court may be invoked where there is destitution and neglect, but as already shown there is no factual basis for such a finding in the present proceeding.'' There was no direct finding of neglect. It was not an issue except in

so far as it may be presumed as a possibility under the sworn allegation of the petition "that there is no means of support through himself [appellant] or relatives."

The appellant as guardian, appearing before the juvenile court on a petition to have that court assume custody of the children did not stand in a more favorable light than a parent. When a child becomes a charge upon the state, the state, with due regard to the child's welfare, should determine the selection of the child's home. This duty has been imposed upon the judge of the juvenile court by statute. " . . . from its very nature and because of necessary qualifications for doing the work for which it is intended" (*In re Jones, supra,* p. 82), the social problems involved should be left to the sound discretion of the juvenile court.

The majority opinion holds that there is "nothing in the juvenile law which may be construed as preventing" appellant from causing a dismissal of the proceeding. There is nothing in the law which requires such action by the court; the matter is purely one of discretion.

The majority opinion does not hold that the judgment was rendered "without any trial", but mention is made that the bill of exceptions so recites. If any question arises upon this point, there is a proper remedy for correcting the record. Certainly it was an inadvertence on the part of the trial judge to sign the document in which some one had inserted that statement. Such a statement is in conflict with the decision of *In re Jones, supra,* which is the law of this case.

The majority opinion mentions that under the direction of the probation officer the children "have since remained in separate private homes in different localities". I find no mention of this in the transcript on appeal. If true, it must have been upon order made after judgment and should play no part in the determination of this appeal. However, its mention in the majority opinion requires comment. Whatever the reason, I am willing to presume, until the record shows to the contrary, that it is sound and good. I am willing to assume that the probation officers, who specialize in child welfare problems, are better informed on matters of this kind than the average layman. It may have been deemed advisable to separate these children for the time being; it may have been thought to their best interests, considering the past bitter prejudices of their mother, as well as appellant

with whom they were residing, for their father's family, that their further exchange of ideas in that regard, as well as perhaps the mulling over of the details of the murder of their mother, was an unhealthy condition. It may have been thought there would be less antagonism toward their father's people if the children were separated for a time. According to the record on appeal "After Mr. Jones' death, Mr. Savage continued as a very close friend of Mrs. Jones, and both he and his wife were in close touch with the family when Mrs. Jones met her death. They immediately went to Contra Costa County and took the children with the understanding that Contra Costa County would continue aid for the children in the Savage home. There were two children born to Mr. and Mrs. Jones, Dorothy, born January, 1925 in Oakland, and Bernard, born August 28, 1928 in Richmond. The children had lived with their mother up to the time of her death. At present they are attending St. Peter's School in San Francisco and have made a very good adjustment in the home of Mr. and Mrs. Savage. There is no question but that the friction between the family of their father and that of their mother has left quite an impression on them, in that we believe that Mrs. Jones constantly prejudiced the children against their father's people and Mrs. Savage has added to this feeling until at present time both children feel that they do not care to go to any of their relatives." The only relative on the father's side living in California was on a trip to England at the time of the death of the mother of the children and she is able and willing to support them; also they should be eligible to part of the paternal grandmother's estate in Ireland upon her death. Upon the return of this relative to this country, she sought to be appointed guardian. The record shows: "She evidently felt that the matter was not worth fighting over after the children had been turned over to Mr. and Mrs. Savage, and she felt that the children had been so prejudiced against her that it would be difficult for them to adjust in her home. However, after Mr. Savage obtained guardianship she started corresponding with this office and definitely stated she would be willing to give the children a home or would take them to Ireland where their relatives could help provide for them." This matter is mentioned only because of the reference in the majority opinion

to the separation of the children, also to indicate the social problem presented to the juvenile judge.

The main question considered in the majority opinion—the sufficiency of the record—is a factual one; namely, are there any inferences that may be drawn from the facts presented to substantiate the finding of the trial court?

The evidence shows appellant took an oath that the children were destitute. Was that in fact true, or was the oath false? The record discloses that while no duty devolved upon appellant to support the children, he could have done so. The record also shows, and the majority opinion holds, that in filing the petition alleging destitution his "only purpose" was to obtain state and county aid. The motion to dismiss' was not based upon the fact that appellant had not read or did not know the contents of the petition he had signed, but that he "was not aware of its legal effect". Appellant was represented at the various hearings on this matter by able counsel.

The judgment declaring the children wards of the juvenile court contains the following: "The above named minor children Dorothy Jones and Bernard Jones having been regularly brought before the above entitled court on the 29th day of March, 1939, upon the verified petition of John Savage their guardian; said children being present and duly represented in Court and the Court having fully examined and considered all of the evidence presented, both in support of, and in opposition to said petition and all and singular the facts and matters appertaining thereto having been fully considered by the court, the court now makes its findings of facts as follows:" The court found that "John Savage, the guardian of said children not able to pay toward the cost of the support and maintenance of said children" and that "all of the statements of fact contained in said petition are true and supported by competent evidence". In the petition sworn to by appellant it was claimed that "the children are destitute". Referring to a report of the juvenile court officer, the majority opinion recites "that without the aid the Savages were amply able to provide for the children". It seems that the conclusion in the majority opinion that the children were not destitute is based upon this report. There was no legal or moral obligation resting upon appellant to support the children. In the sense that the children were

at least subject to the charity of appellant, they were destitute. The estate of their mother, with the exception of a small amount remaining under the control of appellant, has been used in part for the expenses of the children. The girl "was left some insurance and a small savings account by her mother, amounting to about $1400. After an elaborate funeral, which cost around $600, and various attorneys' fees which were paid out of the insurance, there is now in this fund approximately $250." These facts, together with the sworn statement of appellant that the children were destitute, his statement appearing in the record that "he cannot care for the Jones children without State and County aid for their support", also that portion of the report in which it appears that he was unable to support the children entirely and that he claimed that "they are eligible to State and County aid regardless of what his income is and what their relatives may be able to do" were sufficient upon which to base the finding of destitution, and in my judgment negatives the statement in the majority opinion that "there is no factual basis for such a finding in the present proceeding". The probation officer "shall make such investigation as he deems necessary." (Welfare and Institutions Code, sec. 721.) At the times "petitioner with said children appeared in open court", no objections were offered to the filing or the consideration of the reports or statements of the probation officers. The court in its discretion had a right to (Welfare and Institutions Code, sec. 733) consider privately the future, to determine whether the guardian should exercise any control over the ward, to "define the extent of control permitted" and whether the guardian is capable "of providing . . . proper maintenance, training, and education for the person" (Welfare and Institutions Code, sec. 739) "with due regard to the rights and claims of the parents of such person, and to any and all ties of blood or affection, but with the dominant purpose of, serving the best interests of such person." (Welfare and Institutions Code, sec. 784.)

The whole controversy being factual, from which conflicting inferences may be drawn, I am of the opinion that this court is bound by the judgment.

Since preparation of the above dissent, Presiding Justice Peters has written an opinion concurring in the views expressed by Justice Knight. In addition, the concurring opin-

688

ion appears to be a reply to my dissent relative to factual matters. My only comment is that "its [the evidence] weight was for the juvenile court, and not for us." (*In re Stein,* 86 Cal. App. 226, 229 [260 Pac. 566].)

A petition for a rehearing was denied June 6, 1941. Ward, J., voted for a rehearing.

Respondent's petition for a hearing by the Supreme Court was denied June 30, 1941.