43 Cal.App.3d 792 (1974)
118 Cal. Rptr. 398
In re M.J.E., a Minor, on Habeas Corpus.
Docket No. 25878.
Court of Appeals of California, Second District, Division Three.
December 10, 1974.
*795 COUNSEL
Robert G. Eckhoff, Public Defender, and Gilbert W. Lentz, Deputy Public Defender, for Petitioner.
George P. Kading, County Counsel, and Marvin Levine, Deputy County Counsel, for Respondent.
OPINION
POTTER, J.
In this habeas corpus proceeding petitioner seeks to test the validity of his commitment to Camarillo State Hospital pursuant to a juvenile court "Order Committing Minor to Custody of Probation Officer and Authorizing Placement."
Petitioner was 17 years of age when the above order was made. He had been the subject of two juvenile court proceedings prior to the one now pending. The first such proceeding resulted in his being made a ward of the court under section 601 of the Welfare and Institutions Code[1] in May 1972. This wardship was terminated in May 1973. A subsequent petition in November 1973 under section 601 resulted in a finding that the allegations were true but that the petition should be dismissed inasmuch as a single incident was involved. The current proceedings were initiated by petition filed July 2, 1974, which alleged that petitioner "comes within the provisions of Section 602 of the Juvenile Court Law" in that he committed violations of sections 488 and 496, subdivision 1 of the Penal Code. At a jurisdictional hearing conducted July 16, 1974, the allegations of the petition were found to be true; it was ordered that petitioner remain in the custody of his father and stepmother, and the disposition hearing was set for July 30, 1974. On that date, upon motion of "all parties ... to obtain psychiatric evaluation as minor exhibits extreme depressed state," the disposition hearing was continued to August 6, 1974, and Donald S. Patterson, M.D., a psychiatrist, was appointed by the court to evaluate petitioner. Dr. Patterson reported in a letter dated August 2, 1974, that petitioner "does present some degree of a psychotic condition," with "paranoidal type of ideas of reference, delusional beliefs, and somatic delusions" with "a marked disturbance in his reality content." The court psychologist examined petitioner for the chief probation officer and reported that petitioner's behavior *796 had "deteriorated" in comparison to an examination made seven months previously at which time the psychologist had found him to be "a bright, alienated, rebellious and unhappy sixteen-year-old," who was "withdrawn and defensive." The present evaluation was "a severe depressive reaction" requiring "psychiatric evaluation and attention."
On August 6, 1974, the matter was further continued to August 13, 1974, "to see if acceptable at Camarillo State Hospital." Before August 13 petitioner was examined by Gordon A. Runnels, M.D., staff psychologist of the County of Santa Barbara Mental Health Services. Dr. Runnels' report of August 7, 1974, states: "My impression is that [M.] has disturbed mental capacity in reality testing, with total lack of insight into the nature of his predicament, including a marked impairment of judgment, and that [M.] is psychotic at the level of a probable borderline schizophrenia...." Dr. Runnels' recommendation was that petitioner "be placed in a medical setting for psychiatric treatment."
The disposition hearing was held on August 13, 1974, before Juvenile Court Referee Coggen. It resulted in a declaration that petitioner be made a ward of the court under section 602 of the Code, and that he be "placed in care and custody of the Probation Officer, for commitment to Camarillo State Hospital." The probation officer was "instructed to deliver" petitioner to the state hospital.
Petitioner was admitted to Camarillo State Hospital on August 15, 1974, pursuant to such order. On August 19, 1974, a "Motion for Rehearing from Order of Referee" was filed in petitioner's behalf pursuant to section 558 of the Code. On August 20, 1974, a notice of rehearing set August 28 as the date for hearing before the juvenile court judge. Before said hearing date two additional communications were received by the court. One, from Robert W. Hill, psychiatric social worker with the Santa Barbara County Probation Department, reported upon petitioner's admission to Camarillo State Hospital. It stated that his admission diagnosis was "Schizophrenia, Chronic Undifferentiated Type," and added Hill's opinion that petitioner was "appropriately placed in a mental health treatment center and he is in need of continued in-patient care and treatment." The other communication was from petitioner's father. It was a letter dated August 27, 1974, which stated in pertinent part: "I love my boy but I think he needs psychiatric treatments that he could get at the hospital. I am afraid that he will get himself in grave trouble if he does not get psychiatric treatments."
On August 28, 1974, the court continued the matter to September 4, 1974, and ordered petitioner "DETAINED at Santa Barbara County Juvenile *797 Hall pending further hearing. Minor to be released to Probation Officer for preplacement visits for any alternative."
On September 3, 1974, the juvenile court filed its "Memorandum of Intended Decision." In it the judge stated: "This Court feels very strongly that immediate treatment as suggested by the psychiatric report is necessary if we are to preserve this young man's mental health and usefulness to society. It will therefore be the order of this Court that the minor be placed in the care and custody of the Probation Officer for placement in an appropriate environment which may include, if acceptable, placement in Camarillo State Hospital. It will further be the order of the Court that progress reports be secured every 90 days from the institution, agency or private treatment center in which said minor is placed and that the same be filed with this court and brought to the attention of the court so that the progress of said minor may be reviewed."
A formal order was thereafter signed by the judge on September 5, 1974. Said order declared petitioner a ward of the court under section 602 of the Code. The portion of said order, however, which is the subject of review by these proceedings is the following: "IT IS FURTHER ORDERED, pursuant to Section 730 of the Welfare & Institutions Code, that said minor be, and he hereby is, committed to the care, custody and control of the Probation Officer, County of Santa Barbara, for ultimate placement in an appropriate private or public facility, including but limited to either (1) Los Prietos Boys' Camp, or (2) Ruscelli's Boys' Ranch, or (3) Camarillo State Hospital;
".... .... .... .... ...
"IT IS FURTHER ORDERED that, in the event said minor is received in Camarillo State Hospital as a voluntary patient pursuant to Section 6000 of said Welfare & Institutions Code, said minor shall not be actually confined therein for a period of more than six (6) months, and that this matter be placed on calendar for further disposition proceedings on the 180th day of actual confinement after said minor is received in Camarillo State Hospital."
Pursuant to said order, written application for voluntary admission of petitioner to Camarillo State Hospital was made by the probation officer pursuant to section 6000 of the Code on September 12, 1974; petitioner was received in said hospital pursuant to such application and remains there pursuant to such admission.
As grounds for the allegation that the detention of petitioner is illegal, *798 the petition states: "The placement of a minor in a state hospital without proceeding under the Lanterman-Petris-Short Act is improper under the case of In re L.L., 39 Cal App 3d 205, 114 Cal Rptr 11." The facts in support of such grounds in such petition are: "The Juvenile Court Judge in effect committed minor to Camarillo State Hospital on a 602 petition. The validity of such a placement is doubtful in view of In re L.L., cited above."
The "Return to Writ of Habeas Corpus" states "that the minor is not involuntarily committed to said hospital, but is a voluntary patient therein pursuant to Welfare and Institutions Code § 6000." The points and authorities incorporated in the return argue two contentions. First, it is argued that In re L.L., supra, was incorrectly decided. Second, it is contended that petitioner was properly committed as a voluntary patient upon the application of the probation officer pursuant to subdivision (b) of section 6000 of the Code authorizing admission on voluntary application by the minor's "parents, or by the parent, guardian, or other person entitled to his custody."
The "Response to Return to Order To Show Cause" of petitioner incorporates an affidavit of petitioner denying that he has consented to voluntary placement in the state hospital. Petitioner in his points and authorities argues that In re L.L., supra, was correctly decided. Petitioner also argues that section 6000 of the Code either does not or cannot constitutionally authorize the "voluntary" commitment of a minor without his own consent or the consent of a conservator appointed in accordance with the procedures mandated by the Lanterman-Petris-Short Act (§§ 5000-5599 of the Code; hereinafter referred to as the L.P.S. Act), which petitioner equates with due process and equal protection of the laws.
The issues thus presented are: (1) Does the juvenile court have the power to make a direct order of commitment of a juvenile to a state hospital?
(2) Is the probation officer, into whose care and custody a minor is placed as a ward of the juvenile court, by an order specifically granting such authority, a "person entitled to his custody" authorized by section 6000 of the Code to apply for his voluntary admission to a state hospital?

The Juvenile Court Has No Power to Make a Direct Commitment of a Minor to a State Hospital
While this court does not necessarily agree with all that is stated therein, the opinion of the court in In re L.L., supra, 39 Cal. App.3d 205 [114 Cal. Rptr. 11], states persuasive reasons for its conclusion that the power *799 formerly exercised by the juvenile court in the commitment of minors to state mental hospitals was intended to be withdrawn from such court by the provisions of the L.P.S. Act, as amended. Reference need only be made to section 5002 of the Code to establish this proposition. As originally enacted, section 5002 provided: "Mentally disordered persons and persons impaired by chronic alcoholism may no longer be judicially committed.
"Mentally disordered persons shall receive services pursuant to this part. Persons impaired by chronic alcoholism may receive services pursuant to this part if they elect to do so pursuant to Article 3 (commencing with Section 5225) of Chapter 3 of this part.
"Epileptics may no longer be judicially committed.
"This part shall not be construed to repeal or modify laws relating to the commitment of mentally disordered sex offenders, narcotic drug addicts, habit-forming drug addicts, mentally abnormal sex offenders, mentally retarded persons, juvenile court wards, and mentally disordered criminal offenders." (Italics added.)
The prohibition against "mentally disordered persons" being "judicially committed" in said section as originally enacted was specifically made inapplicable to "juvenile court wards" along with the six other classes of mentally disordered persons as to which existing procedures for judicial commitment were retained. However, the last paragraph of section 5002 was amended in 1971 to read as follows: "This part shall not be construed to repeal or modify laws relating to the commitment of mentally disordered sex offenders, mentally retarded persons, and mentally disordered criminal offenders, except as specifically provided in Penal Code Section 4011.6, or as specifically provided in other statutes." (1) Mentally disordered juveniles (who are not mentally disordered sex offenders, mentally retarded persons or mentally disordered criminal offenders) are thus clearly placed in the same category as other nonexcepted "mentally disordered persons" as to whom the section specifically provides that they "may no longer be judicially committed" and instead "shall receive services pursuant to this part."
The procedures by which mentally disordered persons "receive services" narrowly limit the function of the court. Apart from the making of initial orders for 72-hour treatment and evaluation, these functions relate to two types of mentally disordered persons. With respect to imminently dangerous persons, the court is empowered merely to review certifications and recertifications for a 14-day intensive treatment made by a professional person *800 in charge of an intensive treatment facility and by a physician, and to conduct hearings (with a jury, if demanded) upon petitions for 90-day post-certification treatment filed by such professional persons, based upon the actual or threatened infliction of physical harm upon others. The court's determination that a person is mentally disordered is never the sole basis of commitment; either the court reviews determinations made by professional persons (certifications or recertifications), or it determines (with or without a jury) that additional facts require commitment.
With respect to disordered persons who are "gravely disabled persons," the court's function with respect to placement of such persons in a hospital is likewise limited. When conservatorship proceedings are pending pursuant to section 5350 et seq. of the Code, the court (1) hears petitions initiated by professionals to appoint temporary conservators, who may "require the person to be detained ... pending the determination of conservatorship," and (2) conducts the hearing (with a jury, if demanded) to determine if there shall be a conservatorship. If a conservatorship is established, the court order appointing the conservator may specify that he has authority to place the conservatee in a hospital, including a state hospital, in which event the conservator has such authority, but the court is not authorized to make a direct order of commitment.
(2) An order such as that made by the referee in this matter placing petitioner in the "care and custody of the Probation Officer, for commitment to Camarillo State Hospital" and directing the probation officer "to deliver said minor to the proper authorities at Camarillo State Hospital" does not fit into any of the permitted categories of court function in the process by which mentally disordered persons "receive services" under the L.P.S. Act. It is instead clearly a judicial commitment prohibited by section 5002 of the Code.
The validity of petitioner's detention rests upon the effect of the subsequent order of the judge authorizing the probation officer to make application for voluntary admission of petitioner.

Petitioner Was Properly Admitted as a Voluntary Patient on Application of the Probation Officer
The opinion in In re L.L., supra, 39 Cal. App.3d 205, 217, raised but did not answer the question "whether the probation officer, as an agent of the juvenile court, is a `person entitled to the custody of the minor' so as to be entitled, pursuant to section 6000, to make a voluntary commitment of a minor who is a dependent child or ward of the juvenile court." *801 The court found it unnecessary to answer that question inasmuch as there was no evidence in the record that the probation officer had made any such application. In this case, however, such an application was made. It was, moreover, merely authorized, not ordered, by the juvenile court.
Another factor present in this case which was missing in In re L.L., supra, is the consent of petitioner's father. In In re L.L., the court said: "In the instant case neither the minor nor his parents gave their consent to his placement in Napa State Hospital." (39 Cal. App.3d at p. 216.) In the case at bar, petitioner's father, the parent from whose custody he was taken by the order making him a ward of the court, advised the court of his belief that petitioner was in need of "psychiatric treatments that he could get at the hospital" and expressed fear for his future if he did not get such treatment. (3) Reasonably construed, this was consent to his admission.
The propriety of petitioner's detention does not, however, depend upon the sufficiency of his father's consent. (4a) As demonstrated infra, the procedure pursuant to which his need for psychiatric treatment was ascertained by the court, and the order permitting the probation officer to determine the place best suited to provide it, were in all respects in accordance with the law and proper under the circumstances. As a result, the probation officer was a person entitled to petitioner's custody and authorized under section 6000 of the Code to apply for petitioner's voluntary admission.
Petitioner's contention that "[t]he juvenile judge in effect committed minor to Camarillo State Hospital on a 602 petition" is contrary to the facts. What the court did was investigate the mental condition of petitioner and ascertain that he was in need of immediate psychiatric treatment, and having so found, the court authorized the probation officer, into whose care and custody petitioner was placed, to determine his "ultimate placement in an appropriate private or public facility." One of the alternatives authorized was Camarillo State Hospital. The only questions posed by this procedure are: (1) whether the policy of the Code is violated by the court's investigating the matter in the fashion which was employed, and (2) whether section 6000 of the Code authorizes a probation officer having custody of a ward of the juvenile court to make an application for voluntary admission.
There is nothing about the procedure followed which violates any policy set forth in the Code. Only three provisions of the Code purport to state policies which might conflict with the procedure followed by the juvenile court in this case. Section 5002 has already been adverted to. The policy *802 therein expressed is that juveniles (who are not mentally retarded persons, sex offenders or criminal offenders) may not be "judicially committed." (5) The procedure followed in this case, however, did not result in petitioner being "judicially committed" as that term is used in section 5002. This is clear from the fact that one of the means by which a mentally disordered person may "receive services" pursuant to the L.P.S. Act is as the result of the appointment of a conservator pursuant to section 5350 et seq. of the Code by a court order giving the conservator the right to place the conservatee in a hospital, followed by the exercise of such right by the conservator pursuant to section 5358 of the Code. Placement in a mental hospital by such means is by definition a permitted receipt of services pursuant to the L.P.S. Act and not a prohibited judicial commitment. It is obvious, then, that the same procedure followed in the juvenile court, establishing a probation officer as the person entitled to the care and custody of a minor and authorizing him to place the minor in a state hospital, followed by an application by the probation officer for a voluntary admission of such minor, is not a judicial commitment.[2]
The only other provisions of the Code which could have any limiting effect upon the power of the juvenile court in this respect are sections 6500 and 6551. These sections, which comprise article 6 of chapter 2 of part 2 of division 6 of the Code, are the only two sections in such article. Portions of these sections pertinent to the question now before this court are as follows: "If the juvenile court, after finding that the minor is a person described by Section 600, 601, or 602, is in doubt concerning the state of mental health or the mental condition of the person, the court may continue the hearing and proceed pursuant to this article." (§ 6550.)
"If the court is in doubt as to whether the person is mentally disordered or mentally retarded, the court shall order the person to be taken to a facility designated by the county and approved by the State Department of Health as a facility for 72-hour treatment and evaluation. Thereupon the provisions of Article 1 (commencing with Section 5150) of Chapter 2 of Part 1 of Division 5 apply except that the professional person in charge of the facility shall make a written report to the court concerning the results of the evaluation of the person's mental condition. If the professional person in charge of the facility finds the person is, as a result of mental *803 disorder, in need of intensive treatment, he may be certified for not more than 14 days involuntary intensive treatment if the conditions set forth in subdivision (c) of Section 5250 are complied with. Thereupon, the provisions of Article 4 (commencing with Section 5250) of Chapter 2 of Part 1 of Division 5 shall apply to the person. The person may be detained pursuant to Article 4.5 (commencing with Section 5260) or Article 6 (commencing with Section 5300) of Part 1 of Division 5 if the provisions of such articles apply to him." (§ 6551.)
Additional provisions of section 6551 provide that in the event the professional person in charge of the 72-hour facility finds that the juvenile is "mentally retarded," the juvenile court "may direct the filing in any other court" of a petition for judicial commitment of the minor as a mentally retarded person. The effect of section 6551, where proceedings are taken pursuant to said section, with respect to mentally disordered juveniles (who are not mentally retarded), is that they "receive services" pursuant to provisions of the L.P.S. Act in accordance with the procedures therein established.
(6) Any claim, however, that section 6551 provides the exclusive procedure by which the mental condition of a minor may be investigated by the juvenile court and his need for treatment dealt with is fallacious. Section 6550 states that if there is doubt concerning the state of mental health of a minor "the court may continue the hearing and proceed pursuant to this article." (Italics added.) Section 15 of the Code states that "may" is permissive.[3] It is, therefore, clear that the juvenile court is not required to proceed pursuant to section 6551. The mandatory "shall" in section 6551 only becomes operative after the juvenile court has elected to continue the hearing and invoke the procedures therein specified.[4]
*804 The availability to the juvenile court of alternative procedures is made manifest by section 705 of the Code. This section provides: "Whenever the court, before or during the hearing on the petition, is of the opinion that the minor is mentally ill or if the court is in doubt concerning the mental health of any such person, the court may order that such person be held temporarily in the psychopathic ward of the county hospital or hospital whose services have been approved and/or contracted for by the department of health of the county, for observation and recommendation concerning the future care, supervision, and treatment of such person." This provision would, of course, be meaningless if the juvenile court were not empowered to take some action on the basis of the recommendations received by it "concerning the future care, supervision, and treatment" of the minor.
There is a sound basis for the existence of alternative procedures for investigating the mental health of minors. Those procedures specified in section 6551 of the Code are appropriate for the investigation of the need for intensive treatment in a hospital on an in-patient basis. But the juvenile court has need to investigate the mental condition of minors for many purposes unrelated to hospital confinement, such as the authorization of out-patient psychiatric care and the avoidance of inappropriate placements in foster homes or other child care facilities not equipped to cope with such condition.
Further support for the conclusion that the juvenile court is not limited to proceedings pursuant to section 6551 when the mental health and mental condition of the minor are in doubt is found in the fact that section 6551 does not, under any circumstances, mandate the utilization of a conservatorship under section 5350 et seq. of the Code in respect of "gravely disabled" minors. The sections of the L.P.S. Act referred to in section 6551 are those dealing with persons in need of intensive treatment, and no reference is therein made to the conservatorship provisions of the L.P.S. Act. In fact, section 6551 makes no specific reference to "gravely disabled" minors. The disposition to be made of them is, however, covered by the provision that "[i]f the professional person in charge of the facility for 72-hour evaluation and treatment reports to the juvenile court that the minor is not affected with any mental disorder requiring intensive treatment or mental retardation, the professional person in charge of the facility shall return the minor to the juvenile court on or before the expiration of the 72-hour period and the court shall proceed with the case in accordance with the Juvenile Court Law." Section 6551, therefore, does not substitute L.P.S. Act conservatorship for juvenile court wardship of mentally disordered minors. The permissive language of section 5350 *805 ("A conservator may be appointed for a gravely disabled minor" (italics added)) is not altered by section 6551.
There is wisdom in the legislative scheme which permits mentally disordered minors to be dealt with either as juvenile court wards or as gravely disabled conservatees. In the case of a minor approaching majority, the conservatorship has merit in that it may continue beyond his eighteenth birthday for the one-year period specified in section 5361 of the Code without dual proceedings. (7) Such a minor may, moreover, properly fit the definition of "gravely disabled" in section 5008 of the Code which defines such term as "a condition in which a person, as a result of a mental disorder, is unable to provide for his basic personal needs for food, clothing, or shelter." (Italics added.)
A younger minor is, of course, unable to provide for his basic personal needs regardless of his mental condition, not as a result thereof. The term "gravely disabled," therefore, does not truly describe him. Conservatorship proceedings, moreover, may not be as appropriate to the needs of such minors as are juvenile court wardships. For example, though a conservator of a gravely disabled minor may apply for his voluntary admission to a mental hospital under subdivision (b) of section 6000 of the Code, the conservator's powers, as set forth in section 5357 (incorporating Prob. Code, §§ 1852 and 1853), do not facilitate the kind of follow-up care, out-patient treatment and other therapeutic and educational placement available through juvenile court wardships.
(4b) There is, therefore, nothing in the Code which prevents the juvenile court from investigating the mental health or mental condition of a minor for the purpose of appropriately defining by court order the powers of the probation officer with respect to the placement of the minor being committed to his custody. Likewise, there is nothing in the Code prohibiting the inclusion of the power to make a voluntary application for admission to a state hospital. In section 5003[5] of the Code, the L.P.S. Act disavows any intention to limit voluntary applications. Section 5358 permits an L.P.S. Act conservator to exercise the power of voluntary admission over the conservatee "if specified in the court order," and section 6000 states that the voluntary application shall, under such circumstances, "be made by his conservator." Taken together, these sections indicate that *806 the accepted mode for court action with respect to the hospitalization of mentally disordered persons who are neither mentally retarded nor immediately dangerous is by empowering the court-appointed custodian to apply for a voluntary admission.
(8) Affirmative authority for the juvenile court to so act is, moreover, found in sections 731 and 739 of the Code. By its incorporation of the general provisions of section 727, section 731 authorizes the superior court, upon judging a minor a ward of the court on the ground that he is a person described by section 602, to "make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of such minor, including medical treatment, subject to further order of the court." Subdivision (c) of section 739 deals specifically with the matter of defining the probation officer's powers in this area and states that the court may "order that the probation officer may authorize" needed "medical, surgical, dental, or other remedial care for the ward."
Though these provisions may not be construed as negating the L.P.S. Act prohibition against judicial commitments (see In re L.L., supra, 39 Cal. App.3d at p. 214), they do not in this context conflict with that policy.
Petitioner also claims that the manner in which he has been admitted to the state hospital has denied him due process of law. He asserts that if L.P.S. Act conservatorship proceedings had been applied to him, he would have enjoyed the procedural rights therein specified, including trial by jury, right to counsel and commitment only after a finding pursuant to a defined standard. In the absence of these procedural rights, he claims that he has suffered denial of the equal protection of the laws. (9) The procedure followed, however, did not deny him any of these rights except the trial by jury. There is nothing whatever in the record to suggest that petitioner was denied any of the essentials of "due process and fair treatment" made mandatory in In re Gault (1967) 387 U.S. 1, 30 [18 L.Ed.2d 527, 548, 87 S.Ct. 1428]; he was represented by counsel and a judicial determination was made pursuant to a defined standard, to wit, that the authority given the probation officer was reasonably required for the care of petitioner and was "remedial care" which appeared necessary.
The fact that petitioner did not receive a jury trial remains the only respect in which he was treated any differently than an adult subject to L.P.S. Act conservatorship proceedings would have been treated. The denial of a jury trial clearly was not a denial of due process. As this court said, in In re Clarence B., 37 Cal. App.3d 676, 679-680 [112 Cal. Rptr. 474]: "Defendant contends that he should have been granted a jury trial. *807 However, both before and after In re Gault (1967) 387 U.S. 1 [18 L.Ed.2d 527, 87 S.Ct. 1428], California courts have uniformly held that a jury trial is not constitutionally required in juvenile court proceedings. (In re Daedler (1924) 194 Cal. 320, 332 [228 P. 467]; In re Dennis M. (1969) 70 Cal.2d 444, 456-457 [75 Cal. Rptr. 1, 450 P.2d 296] [by implication]; In re T.R.S. (1969) 1 Cal. App.3d 178, 182 [81 Cal. Rptr. 574]; In re Joe R. (1970) 12 Cal. App.3d 80, 84 [90 Cal. Rptr. 530].) In re Steven C. (1970) 9 Cal. App.3d 255, 260-261 [88 Cal. Rptr. 97], adhered to this rule holding that a different view was not compelled by In re Winship (1970) 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068]; California's constitutional guarantee of a jury trial under California Constitution, article 1, section 7, has not yet been extended to juveniles. (In re Daedler, supra.)
"... Insertion of the requirement of a jury trial in juvenile proceedings would result in placing the minor into the full adversary process and would put an end to an informal and private proceeding, which is necessary to accomplish the policies underlying the existence of the juvenile court. (McKeiver v. Pennsylvania, 403 U.S. 528 [29 L.Ed.2d 647, 91 S.Ct. 1976].)"
Petitioner's reliance upon In re Gary W., 5 Cal.3d 296 [96 Cal. Rptr. 1, 486 P.2d 1201], and Humphrey v. Cady (1972) 405 U.S. 504 [31 L.Ed.2d 394, 92 S.Ct. 1048], is misplaced. Neither of these cases involved a juvenile.
There remains only the question whether a probation officer, given authority by an order of the juvenile court committing a minor to his custody, is a person qualified to apply for voluntary admission to the state hospital.
Subdivision (b) of section 6000 of the Code provides: "In the case of a minor person, the application shall be made by his parents, or by the parent, guardian, or other person entitled to his custody to any of such mental hospitals as may be designated by the Director of Health to admit minors on voluntary applications. If the minor has a conservator of the person, or the person and the estate, appointed under Chapter 3 (commencing with Section 5350) of Part 1 of Division 5, with the right as specified by court order under Section 5328 to place the conservatee in a state hospital the application for the minor shall be made by his conservator."
(10) The language employed eliminates any possible argument that the volition of the minor is pertinent. A minor could not be voluntarily admitted on his own application even if he tried. (4c) Likewise foreclosed is any argument such as that made by petitioner that the words "other person entitled to his custody" refer "to a foster parent or a relative *808 entitled to legal custody." The final sentence demonstrates clearly that a person given custody by court order is intended to be included. This language likewise forecloses petitioner's argument that it would be "anomalous if the power of the probation officer were greater than the juvenile court." The same relationship is expressly established between the power of the conservator and that of the court. Moreover, the anomaly is more apparent than real in both cases. Neither the conservator nor the probation officer has greater power than the court. In either case, a concurrent exercise of power is required. The court must act to empower the custodian and he, in turn, must exercise that power.
The propriety of the detention of a minor in a state hospital, on the basis of his parents' consent, is also questioned by petitioner. He cites no authority, however, in support of this challenge, and in view of the clear propriety of the probation officer's application, this question does not require decision. The court notes, however, that the apparent power of the parent, like that of any other person making such application, is subject to the rules and regulations established by the State Department of Health governing such applications and that the required form includes a stipulation as follows: "I further agree to termination of treatment upon the decision of the Medical Director." A minor so committed is, therefore, not subject to being held beyond the time deemed necessary for his treatment by the director of the hospital. He is also free to leave at any time the person entitled to his custody so requests. (Code, § 6005.)
Since we have held that the juvenile court properly empowered the probation officer to apply for voluntary admission, the probation officer's application was made by a person entitled to petitioner's custody for such purpose. Said application having been accepted, petitioner is lawfully detained in said state hospital.
The petition for writ of habeas corpus is, therefore, denied.
Ford, P.J., and Allport, J., concurred.
NOTES
[1] Unless otherwise indicated, all future references to the "Code" in this opinion are references to the Welfare and Institutions Code.
[2] The fact that a jury might be demanded in the L.P.S. Act conservatorship proceeding is not a significant distinction since the jury would have no control over the inclusion of the critical provision in the order and the question whether the conservatorship could result in such commitment would depend entirely upon the judge's action with respect thereto.
[3] Section 15 of the Code reads as follows: "`Shall' is mandatory and `may' is permissive."
[4] Our conclusion in this respect may conflict with certain language of the court in In re L.L., supra, specifically the following statement (39 Cal. App.3d at p. 212): "It is clear that the procedure for the evaluation of a ward of the juvenile court concerning whom the juvenile court is in doubt as to whether he is mentally disordered or mentally retarded is that provided for in section 6551. Accordingly, when such a doubt exists the juvenile court shall order the ward to the facility indicated in the Act for a 72-hour treatment and evaluation." Insofar as this statement implies that the procedure specified in section 6551 is mandatory when the court has not elected, pursuant to the permissive language of section 6550, to proceed in accordance with section 6551, it is contrary to the views of this court. In the context in which it was made, however, the statement correctly characterizes section 6551 as reinforcing the L.P.S. Act prohibition against minors being "judicially committed" by a juvenile court. The court was not considering the propriety of juvenile court evaluation of a minor's mental condition in respect of any other objective.
[5] Section 5003 of the Code reads as follows: "Nothing in this part shall be construed in any way as limiting the right of any person to make voluntary application at any time to any public or private agency or practitioner for mental health services, either by direct application in person, or by referral from any other public or private agency or practitioner."